USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _______________
DATE FILED: 7/7/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

PANDAVIDA, INC.,

Petitioner,

-v-

AMAZON.COM SERVICES LLC, *et al.*,

Respondents.

------------------------------------------------------------- X

1:25-cv-6177-GHW

MEMORANDUM OPINION & ORDER

GREGORY H. WOODS, United States District Judge:

PandaVida, Inc. ("PandaVida") sold products on the website operated by Respondents Amazon.com Services LLC and Amazon.com, Inc. (collectively "Amazon"). In 2015, the parties entered a Business Services Agreement (the "BSA"), which outlined Amazon's policies for sellers and set forth the actions Amazon could undertake in response to violations of those policies. The BSA included an arbitration clause.

In 2021, Amazon deactivated PandaVida's seller accounts after detecting fraudulent activity associated with those accounts. The parties settled that dispute and executed a settlement agreement (the "Settlement Agreement"). The Settlement Agreement set forth the subject matter it resolved and the parties' obligations going forward. That agreement included a merger clause and a forum selection clause stating that the parties consented to the "exclusive jurisdiction" of Washington courts for resolution of disputes "arising out of or relating to" the Settlement Agreement.

In 2023, Amazon once again detected fraudulent activity and began an enforcement action. PandaVida initiated an arbitration before the American Arbitration Association, asserting that Amazon breached the BSA. Amazon answered and asserted several counterclaims, including that PandaVida had breached the Settlement Agreement. The assigned arbitrator found for Amazon on PandaVida's claims and Amazon's counterclaims—including a finding that PandaVida breached the

Settlement Agreement—and awarded Amazon $578,511.02 in damages and attorneys' fees.

PandaVida initiated this action seeking to vacate that award, asserting that the assigned arbitrator exceeded his authority in issuing the award and that the award was issued in manifest disregard of the law. Amazon cross-petitioned the Court to confirm the award. Because the arbitrator properly reached the merits of PandaVida's claims and most of Amazon's counterclaims, the Court cannot vacate the award in full. Because the arbitrator exceeded his authority in reaching the issue of whether PandaVida breached the Settlement Agreement, which contains a mandatory forum selection clause that supersedes the parties' arbitration agreement, the Court cannot confirm the award in full.

## I. BACKGROUND[1]

### A. The Business Services Agreement

PandaVida began operating an e-commerce business as a third-party seller on Amazon in 2015. Dkt. No. 1 ("Pet.") ¶ 12. As part of its e-commerce business, PandaVida utilized the Fulfillment by Amazon ("FBA") program. Dkt. No. 26-1 ("Interim Award") at 15. FBA allows sellers to ship their inventory to Amazon warehouses for storage where Amazon will then use it to fulfill customer orders directly. *Id.* at 13.

By registering a seller account, PandaVida agreed to comply with Amazon's Business Services Agreement (the "BSA"). *See* Dkt. No. 26-3 ("BSA"). The BSA outlined several policies that sellers on Amazon's platform must follow. Among these are the terms and conditions of the FBA program. BSA § F.

Section 2 of the BSA also identified the enforcement actions that Amazon could take against

---

[1] The facts are drawn from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' cross-petitions to vacate and confirm the award. They are undisputed in relevant part unless otherwise noted.

sellers that violated its policies:

> If we determine that your actions or performance may result in returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties, then we may in our sole discretion withhold any payments to you for as long as we determine any related risks to amazon or third parties persist . . . . If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity . . . , or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.

BSA § 2 (emphasis omitted). Amazon also reserved for itself the right to immediately suspend or terminate accounts that its controls identify "may be used for deceptive or fraudulent, or illegal activity" or whose "use of the Services has harmed, or our controls identify that it might harm, other sellers, customers, or Amazon's legitimate interests . . . ." BSA § 3.

As is relevant to this dispute, the BSA contains an arbitration clause:

> Amazon and you both consent that any dispute with Amazon or its Affiliates or claim *relating in any way to this Agreement or your use of the Services* will be resolved by binding arbitration as described in this paragraph, rather than in court . . . .

BSA § 18 (emphasis added).

**B. The Settlement Agreement**

In 2021, Amazon's monitoring systems flagged several buyer accounts of Isaac and Madeline Lapidus (the "Lapiduses"). *See* Dkt. No. 26-2 ("Amazon Arb. Br.") at 6. The Lapiduses own PandaVida and operate PandaVida's seller accounts. *See id.* Amazon asserted that the Lapiduses and PandaVida used multiple customer and seller accounts to commit a fraud wherein they would purchase a higher value item through a buyer account, return a less valuable version, pocket the difference, and re-sell the original higher value item through one of their seller accounts. *Id.* Following an investigation, Amazon deactivated the relevant accounts and sent a cease-and-desist letter to the Lapiduses in September 2021. *Id.* at 7. Amazon.com, Inc. settled the dispute with the Lapiduses, "and their business entities, agents, and associates" (the "Lapidus Parties"). *See* Dkt. No. 26-6 ("Settlement Agreement") at 1. Accordingly, Amazon.com, Inc. and the Lapidus Parties

(collectively, the "Parties") entered into the Settlement Agreement.

The Settlement Agreement outlined the subject of the dispute between the Parties. The Settlement Agreement identified two third-party seller accounts (the "Subject Seller Accounts") and seven Amazon customer accounts that were used to purchase and return products (the "Subject Customer Accounts"). Settlement Agreement at 1. It described the dispute and the settlement as follows:

> D. The Parties are engaged in a dispute regarding return and sales activity of the Subject Seller Accounts and the Subject Customer Accounts that occurred through the Effective Date ("Dispute"). In connection with this Dispute, Amazon blocked the Subject Seller Accounts and Subject Customer Accounts.
>
> E. The Parties wish to conclude and finally resolve, without further legal proceedings, *all claims arising out of or relating to the Dispute*, to avoid the cost, expense, and inconvenience of litigation, and to settle the same according to the terms and conditions of this Agreement.

Settlement Agreement at 1–2 (emphasis added).

The Lapidus Parties agreed to refrain from using "any . . . Amazon account, whether opened before or after the Effective Date, to fraudulently return or purchase products, or to engage in any other unlawful or prohibited activity." *Id.* § 3(a). Following the section describing these obligations, the agreement provided as follows:

> Nothing in this Paragraph alters, modifies, or replaces the obligations and requirements in any other agreements between the Parties applicable to the Subject Seller Accounts or any Amazon customer accounts opened by the Lapidus Parties. Among other things, Amazon maintains the right to enforce the Subject Seller Accounts or any Amazon customer accounts opened by the Lapidus Parties according to those agreements for conduct other than the Dispute.

*Id.* § 3.

Amazon "retain[ed] the right to take action on accounts controlled by the Lapidus Parties, including without limitation suspending, blocking, or closing accounts, for any future violations of agreements between the Parties, including Amazon's Conditions of Use and Business Solutions Agreement." *Id.* § 5(c).

As is relevant to this dispute, the Settlement Agreement included a forum selection clause and a merger clause. The forum selection clause reads as follows:

> **<u>Jurisdiction & Venue.</u>** The Parties consent to *exclusive jurisdiction and venue* in the United States District Court for the District of Washington, and if for any reason that court lacks subject-matter jurisdiction, state court located in King County for the adjudication of *any dispute arising from or relating* to this Agreement.

*Id.* § 7 (emphasis added). The merger clause reads as follows:

> **<u>Entire Agreement</u>.** This Agreement constitutes the entire agreement of the Parties with respect to *this subject matter*, and it supersedes all prior negotiations and agreements, both written and oral, between the Parties with respect to *this subject matter*.

*Id.* § 12 (emphasis added).

**C. The Arbitration**

In 2023, Amazon's systems "flagged PandaVida and Lapidus" for fraudulent activity. Amazon Arb. Br. at 7–8. Amazon found that PandaVida had engaged in "inventory reimbursement abuse." *Id.* Under this scheme, PandaVida would request reimbursement for inventory that it never sent Amazon. *See id.* Amazon permanently suspended PandaVida's seller account in February 2023, declined to disburse any further funds to PandaVida, and declined to return PandaVida's inventory. *Id.*

On November 1, 2023, PandaVida filed a demand for arbitration (the "Demand") with the American Arbitration Association (the "AAA"). Dkt. No. 26-7 ("Demand"); *see also* Dkt. No. 26-11 ("AAA Rules"). PandaVida asserted that Amazon breached the BSA and committed conversion by refusing to reimburse lost inventory, withholding inventory and funds, charging PandaVida storage fees, and declining to reinstate PandaVida's account. *See generally* Demand. The Demand asserted that the "BSA is governed by . . . the Federal Arbitration Act and other applicable federal law, in accordance with Section 18 of the BSA." *Id.* ¶ 34. The Demand sought declaratory, injunctive, and monetary relief, including a declaration that Amazon had breached the BSA. *Id.* ¶ 37.

On November 27, 2023, Amazon answered PandaVida's demand and asserted several affirmative defenses. Dkt. No. 26-8 ("Amazon Ans.") at 4–5. Amazon also asserted counterclaims for breach of the BSA, breach of the Settlement Agreement, fraud, negligent misrepresentation, and violations of the Washington Consumer Protection Act ("WCPA"). *Id.* at 11–14. PandaVida answered Amazon's counterclaims on January 2, 2024, asserting several affirmative defenses. Dkt. No. 26-12 ("PandaVida Ans.").

On February 4, 2024, the AAA appointed Andrew B. Turk to serve as the arbitrator (the "Arbitrator"). Dkt. No. 26-4. In the months that followed, both parties served initial disclosures and written discovery requests. Dkt. No. 26-9 ("Preliminary Order") at 3.

The Arbitrator held a preliminary hearing on October 7, 2024. *Id.* Both parties were present at that hearing. *Id.* Amazon sought leave to file a motion to dismiss, which the Arbitrator granted. *Id.* Amazon premised its motion on PandaVida's "failure to respond to discovery or otherwise meaningfully participate in the mediation process." *Id.* In an order dated November 21, 2024, the Arbitrator denied that motion but found that PandaVida had willfully refused to participate in the arbitration process. *Id.* at 3–4. As a result, the Arbitrator held that Amazon need not comply with PandaVida's belated discovery requests and limited PandaVida's ability to present evidence at the final hearing. *Id.* at 4–5.

The Arbitrator scheduled the final hearing in January 2025. *See id.* at 5. In advance of the hearing, Amazon submitted its pre-hearing brief on January 3, 2025. Interim Award at 5. The pre-hearing brief asserted that Amazon should prevail on each of its counterclaims and that PandaVida was liable for actual damages, statutory damages, and attorneys' fees and costs. *See generally* Amazon Arb. Br. PandaVida did not submit a pre-hearing brief or any evidence, documents, submissions, or exhibits in advance of the evidentiary hearing. Interim Award at 5.

The evidentiary hearing was held over the course of three days in January 2025. Tullman

Decl. ¶ 2. During its closing presentation, PandaVida argued that the Arbitrator "lack[ed] jurisdiction over Amazon's counterclaim" for breach of the Settlement Agreement, contending that the Settlement Agreement's forum selection clause superseded the arbitration agreement in the BSA. Dkt. No. 1-3 ("Closing Presentation") at 19.

The Arbitrator issued the Interim Award on March 3, 2025. Interim Award. The Arbitrator found for Amazon on each of PandaVida's claims and for Amazon on Amazon's counterclaims for breach of the Settlement Agreement, breach of the BSA, and violations of the WCPA. Interim Award at 2–3. As is relevant to the arguments that PandaVida now raises in support of its motion to vacate the Arbitrator's award, the Arbitrator found that PandaVida was not entitled to reimbursement of storage fees because "[b]y express agreement, [PandaVida] granted [Amazon] the right to charge storage fees for its FBA inventory." *Id.* at 17.

As for Amazon's claims, the Arbitrator held that PandaVida breached the BSA, that it breached the Settlement Agreement, and that it violated the WCPA. *Id.* at 17–18. The Arbitrator described his disposition of the counterclaim asserting breaches of the Settlement Agreement as follows:

> The Settlement Agreement imposed certain obligations on Claimant, as one of the "Lapidus Parties." Importantly, those obligations are entirely consistent and, *in most cases*, duplicative of Claimant's obligations as a seller under the BSA. The Arbitrator finds that the evidence establishes *multiple violations of the Settlement Agreement*.

Interim Award at 17 (emphasis added). Thus, the Arbitrator's award found in favor of Amazon and against PandaVida on Amazon's breach of the Settlement Agreement Counterclaim. *See id.* at 19; *see also* Final Award (incorporating interim award by reference). The Arbitrator also found for Amazon its counterclaim asserting breaches of the BSA and its counterclaim asserting violations of the WCPA. Interim Award at 19.

The Arbitrator awarded Amazon exemplary damages, attorneys' fees, and damages. The Arbitrator awarded Amazon $25,000 in exemplary damages under the WCPA. Interim Award at 20.

He concluded that Amazon was entitled to recover attorneys' fees under the WCPA. *Id.* at 18. He found that although Amazon was also entitled to fees under the Settlement Agreement, "all fees incurred by [Amazon] are recoverable under the [WCPA], and that award of fees . . . subsume[d] those awarded for breach of the Settlement Agreement." *Id.* at 18.

The Arbitrator also awarded Amazon $299,999.00 in damages. *Id.* at 20. The Arbitrator did not apportion the damages amount across the three counterclaims for which he found for Amazon. *See id.* In discussing the damages for PandaVida's violation of the WCPA, the Arbitrator held that "the damages under the Act *largely* mirror those already awarded under other claims." *Id.* at 18.

The Arbitrator ordered Amazon to file an application for attorney's fees and costs. *Id.* at 20. Amazon filed that application and sought $249,809.50 in fees and $21,952.52 in costs. Final Award at 1. PandaVida was permitted to file a response or objection, but it did not submit any brief. Final Award at 2. PandaVida instead "timely filed a general objection," which "incorporated objections made at the arbitration hearing." *Id.* Counsel for also PandaVida emailed its objection to Amazon and the Arbitrator, stating in full: "Claimant objects to Respondent's application for fees and costs for the reasons Claimant presented during the underlying arbitration hearing." Dkt. No. 26-13 at 3.

On April 28, 2025, the Arbitrator issued the Final Award. *See generally* Final Award. He incorporated the Interim Award by reference. *Id.* In addition to the $299,999.00 in damages and $25,000 in exemplary damages, he awarded attorneys' fees and costs. *Id.* The final monetary award totaled $578,511.02. *Id.* at 3.

**D. Procedural History**

On July 28, 2025, PandaVida filed this petition to vacate the arbitration award. *See* Dkt. No. 1 ("Pet"). On November 7, 2025, PandaVida filed its memorandum of law in support of its petition. Dkt. No. 23 ("PandaVida Mem."). PandaVida argued that the award should be vacated because the Arbitrator had exceeded his authority. *Id.* at 3–7. In particular, PandaVida argued that

the Settlement Agreement superseded all prior agreements, including the BSA. *Id.* at 3–5. PandaVida argued that because the dispute submitted to the Arbitrator arose from or related to the Settlement Agreement, the Arbitrator was bound by the forum selection clause and therefore could not resolve any of the claims in the arbitration. *Id.* at 5–7. PandaVida also argued that the award was issued in manifest disregard of the law. *Id.* at 7–9. PandaVida repeated its argument that the Arbitrator ignored the terms of the Settlement Agreement by exercising authority over the dispute. *Id.* at 7–8. PandaVida also argued that other portions of the substance of the award evinced the Arbitrator's manifest disregard of the law, including the Arbitrator's decision to deny PandaVida's request for reimbursement of storage fees and the Arbitrator's decision to award what PandaVida argued was an "arbitrary" amount of damages. *Id.* at 8.

On December 5, 2025, Amazon filed its brief in support of its cross-petition to confirm and in opposition to the motion to vacate. Dkt. No. 25 ("Amazon Mem."). Amazon first argued that PandaVida had waived any objection to challenging the jurisdiction of the Arbitrator by initiating arbitration and only raising its jurisdictional objection in their closing. *Id.* at 12–15. Amazon then argued that, in the alternative, the Arbitrator did not exceed his authority because the BSA "continue[d] to govern the parties' relationship and serve[d] as the basis for the award." *Id.* at 15–23. In particular, Amazon pointed to the language in the Settlement Agreement that it argued limited the scope of that agreement and "preserved the applicability of the BSA." *Id.* Amazon also argued that the merger clause was similarly limited in scope. *Id.* Finally, Amazon argued that the Arbitrator had not issued the award in manifest disregard of the law because he had the authority to enter the award, because the Arbitrator correctly interpreted the BSA's storage fee provisions, and because the Arbitrator's award of damages could be inferred from the facts of the case. *Id.* at 23–26.

On December 29, 2025, PandaVida filed its reply in further support of its petition to vacate

and in opposition to the cross-motion to confirm. Dkt. No. 33 ("PandaVida Reply"). PandaVida argued that it had not waived objections to the Arbitrator's jurisdiction because it had raised the objection before a ruling on the merits. *Id.* at 1–3. PandaVida next reprised its argument that the dispute arose from or related to the Settlement Agreement by virtue of Amazon's defenses and counterclaims. *Id.* at 3–4. PandaVida next argued that Amazon's interpretation of the Settlement Agreement as preserving the BSA's arbitration clause was flawed, and that the Settlement Agreement governed the entire dispute submitted to arbitration. *Id.* at 4–9. Finally, PandaVida reprised its argument that the award was issued in manifest disregard of the law. *Id.* at 10.

The cross-petitions were fully submitted when Amazon submitted its reply in support of its motion to confirm on January 15, 2026. Dkt. No. 35 ("Amazon Reply"). Amazon repeated its argument that PandaVida waived any objections to arbitration, arguing that the authorities PandaVida relied on instead supported a finding of waiver. *Id.* at 2–4. Amazon then argued that the BSA—not the Settlement Agreement—governed the dispute because the conduct that gave rise to the dispute occurred after the Settlement Agreement was executed and the counterclaims that formed the basis for the Arbitrator's award did not concern the Settlement Agreement. *Id.* at 4–6; 10–11. Amazon then repeated its argument that the BSA's arbitration clause had not been superseded by the terms of the Settlement Agreement. *Id.* at 6–10.

## II. LEGAL STANDARD

Under Section 10 of the Federal Arbitration Act ("FAA"), a court "may make an order vacating the award upon the application of any party to the arbitration" in "any of the following cases":

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to

> the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In addition to these grounds, the Second Circuit has recognized an additional "judicially-created ground, namely that 'an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law.'" *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011) (quoting *Westerbeke Corp. v. Daihatsu Motor Co., LTD.*, 304 F.3d 200, 208 (2d Cir. 2002)).

To obtain relief on these grounds, petitioners "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010); *accord Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (describing the "heavy burden" petitioners face in seeking vacatur of an arbitral award). The Second Circuit has "repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process." *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) (quoting *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007)). The grounds for vacatur set forth in the FAA "all . . . involve corruption, fraud, or some other impropriety on the part of the arbitrators." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). Accordingly, "[i]t is not enough for petitioners to show that the panel committed an error—or even a serious error." *Stolt-Nielsen*, 559 U.S. at 671.

District courts "treat a petitioner's application to confirm or vacate an arbitral award as akin to a motion for summary judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 (2d Cir. 2011) (internal quotation marks omitted). The "party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006). "Generally, the arbitrator's rationale for an award need not be explained," *Leeward Constr. Co., Ltd. v. Am. Univ. of Antigua-Coll. Of Med.*, 826 F.3d 634, 638 (2d Cir. 2016) (internal quotation marks omitted), and "only a barely colorable justification

for the outcome reached by the arbitrators is necessary to confirm the award." *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 378–79 (2d Cir. 2023) (quotation marks and alterations omitted). This "severely limited" review avoids frustrating the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian*, 668 F.3d at 71–72 (quotation marks and citations omitted).

## III. DISCUSSION

### A. The Arbitrator's Authority

Though the Arbitrator exceeded his authority in reaching the issue of liability under the Settlement Agreement, the Court cannot determine the extent to which the award should be vacated or confirmed on this record. Section 10(a)(4) permits courts to vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). An arbitrator's powers are largely "a matter of contract," as "a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996)). "The scope of an arbitrator's authority thus 'generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.'" *Id.* (quoting *Synergy Gas Co. v. Sasso*, 853 F.2d 59, 63–64 (2d Cir. 1988)). Accordingly, "in considering a section 10[a](4) challenge, '[t]he principal question for the reviewing court is whether the arbitrator's award draws its essence' from the agreement to arbitrate, 'since the arbitrator is not free merely to dispense his own brand of industrial justice.'" *Id.* (quoting *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005)).

Accordingly, "[t]he focus of [the] inquiry . . . under section 10(a)(4) is 'whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, *not whether the arbitrators correctly decided that issue.*'" *Jock*, 646 F.3d at 122 (quoting *DiRussa*

*v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997)) (emphasis in original). A challenged award will be upheld so long as "a barely colorable justification for the outcome reached by the arbitrators" is discernible. *Smarter Tools*, 57 F.4th at 378–79. "In other words, 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' a court's conviction that the arbitrator has 'committed serious error' in resolving the disputed issue 'does not suffice to overturn his decision.'" *ReliaStar*, 564 F.3d at 86 (quoting *United Paperworkers Int'l Union AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). Under these standards, an arbitrator "may exceed her authority by, first, considering issues beyond those the parties have submitted for her consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 646 F.3d at 122. Therefore, determining whether the Arbitrator exceeded his authority in granting Amazon the award requires a determination of the parties' agreement.

The Arbitrator exceeded his authority by reaching the issue of whether PandaVida was liable for breaches of the Settlement Agreement but did not exceed his authority in reaching the other claims raised by the parties. "Although a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct." *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1105 (2d Cir. 1991); *cf. Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 231 (2d Cir. 1982) ("[I]t is hornbook law that parties by their conduct may agree to send issues outside an arbitration clause to arbitration."). "[I]f a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003). So long as a party "clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court." *Id.* at 368–69 (quoting *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th

Cir. 2000)). "Even where a party participates in arbitral proceedings, it is not deemed to have waived its objection to arbitrability of an issue if it 'consistently and vigorously maintained its objection to the scope of arbitration.'" *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 579 (S.D.N.Y. 2024) (quoting *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 9 n.10 (1st Cir. 2000)).

PandaVida waived any objection to the Arbitrator's authority to resolve all issues in the arbitration except for Amazon's counterclaim of breach of the Settlement Agreement. As described above, PandaVida initiated the underlying arbitration in front of the AAA—as provided for in the BSA—asserting several claims arising out of the BSA. *See* Demand.[2] Its complaint and demand for arbitration attached the BSA, which included a mandatory arbitration provision. *See id.* Amazon answered. *See* Amazon Ans. At no point did either party dispute the Arbitrator's authority to resolve PandaVida's claims. Therefore, both parties agreed to arbitrate those claims as provided for in the BSA. Amazon also asserted counterclaims for breach of the BSA, breach of the Settlement Agreement, fraud, negligence, and violations of the WCPA. *See* Amazon Ans. PandaVida objected to the Arbitrator's jurisdiction over Amazon's counterclaim for breach of the Settlement Agreement and argued that the Settlement Agreement's forum selection clause and merger clause superseded the BSA's arbitration agreement with respect to that counterclaim. *See* Closing Presentation at 18–19. However, at no point during the arbitration proceedings did PandaVida object to the Arbitrator's authority to decide the remaining counterclaims or to the Arbitrator's authority to consider the Settlement Agreement in resolving its affirmative claims.[3] Thus, by initiating an

[2] For this reason, PandaVida's argument that it did "little more than appear at the arbitration hearing" is without merit. PandaVida Reply at 3. PandaVida manifested the clearest intent to arbitrate at least its own claims by initiating the arbitration.

[3] PandaVida did include an objection to the ability of the Arbitrator to resolve the fraud and negligence claims to the extent they were "grounded in [] the 2021 Settlement." Closing Presentation at 21. The Arbitrator did not reach the fraud claim. Interim Award at 19. The Arbitrator did reach the negligence claim, but he resolved it in PandaVida's favor because, he held, Amazon could not recover damages "for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses." *Id.* As discussed, the Arbitrator found that the BSA remained in force in issuing the award. *See generally* Interim Reward.

arbitration under the terms of the BSA and failing to object to the Arbitrator's authority to reach the claims it had submitted to arbitration, PandaVida waived its right to argue those claims could not be resolved in arbitration as a function of the Settlement Agreement's forum selection clause and merger clause. Accordingly, the Arbitrator did not exceed his authority in reaching PandaVida's claims and most of Amazon's counterclaims.

However, the Arbitrator did exceed his authority in reaching the issue of whether PandaVida breached the Settlement Agreement. The parties' conduct did not imply agreement to submit the question of whether PandaVida breached the Settlement Agreement to arbitration. Although PandaVida initiated an arbitration asserting breaches of the BSA, its conduct during the arbitration did not imply that it also sought to arbitrate the issue of breach of the Settlement Agreement. Its participation in the arbitration proceedings of the merits of the Settlement Agreement counterclaim was not extensive. At no stage in the arbitration proceedings did PandaVida propound any argument specific to the issue of whether it breached Settlement Agreement in any meaningful way. In response to Amazon's counterclaims, PandaVida did not specifically address the merits of any counterclaim. *See* PandaVida Answer. It "generally denie[d] the allegations" and propounded a number of affirmative defenses "[w]ithout limiting or waiving any available defenses." *Id.* The Arbitrator found that PandaVida had willfully refused to participate in discovery generally. Preliminary Order at 3. Ahead of the final hearing, PandaVida did not submit a prehearing brief. On the record before the Court, the only time that PandaVida took the opportunity to propound arguments on the counterclaims, it objected to the jurisdiction of the Arbitrator over the Settlement Agreement counterclaim and did not propound any argument on the merits. *See* Closing Presentation at 18–19. It repeated that objection before the Arbitrator issued the final award. *See* Dkt. No. 26-13. Thus, PandaVida did not waive its right to object to the Arbitrator's authority to decide the issue of breach of the Settlement Agreement.

In asking the Court to find that PandaVida's conduct implied agreement to arbitrate the issue of breaches of the Settlement Agreement, Amazon relies on inapposite authority. In its opening brief, Amazon cites *Hernandez v. Telecom Business Solution, LLC*, No. 24-CV-03457, 2024 WL 3401092 (S.D.N.Y. July 12, 2024). Amazon Mem. at 13–14. However, that case concerned whether a party had waived its right to request a judicial stay of an arbitration in progress. *Hernandez*, 2024 WL 3401092, at *3. The court was explicit that—notwithstanding its decision to deny the motion to stay—"[a]rbitrability issues that have effectively been preserved can be raised in *post*-arbitration judicial proceedings." *Id.* (citation omitted) (emphasis in original). Amazon also relies on the Ninth Circuit's decision in *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355 (9th Cir. 1983). Amazon Mem. at 14; *see also* Amazon Reply at 3 (citing *Ribadeneira v. New Balance Athletics, Inc.*, 65 F.4th 1, 16 (1st Cir. 2023) (quoting *Daniel*, 724 F.2d at 1357), and discussing *Ribadeneira*'s reliance on *Daniel*). *Daniel* is factually inapposite. In that case, all the relevant written agreements between the parties included arbitration clauses. *See Daniel*, 724 F.2d at 1356. After "voluntarily participat[ing]" in the arbitration proceedings for several months, Appellant Richard Daniel denied his obligation to arbitrate the entire dispute. *Id.* at 1357. Here, however, PandaVida objected to Arbitrator's authority to decide a single counterclaim of breach of contract. *See* Closing Presentation at 18–19. It did so based on an argument that the breach claim was subject to a mandatory forum selection clause in an agreement that it argued superseded an earlier agreement to arbitrate. Accordingly, PandaVida did not waive its objection to the Arbitrator's authority to decide the issue of whether it breached the Settlement Agreement.

By the terms of the Settlement Agreement, the parties did not agree in writing to submit claims relating to breaches of the Settlement Agreement to arbitration. "The FAA embodies a federal policy favoring arbitration. Courts thus apply a presumption of arbitrability, but only if an enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand."

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301–02 (2010)) (internal quotation marks omitted). "Because the question presented here concerns whether an arbitration agreement remains in force in light of a later-executed agreement, the presumption does not apply." *Id.* In the Second Circuit, "an agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause specifically precludes arbitration . . . , but there is no requirement that the forum selection clause mention arbitration." *Id.* (internal citations and quotations omitted).

The Settlement Agreement superseded the agreement to arbitrate in the BSA for "any dispute arising out of or related to" the Settlement Agreement. A subsequent agreement that does not mention arbitration may nonetheless preclude arbitration of an issue if it includes a forum selection clause that is "all-inclusive" and "mandatory." *See id.*; *see also Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 525–26 (2d Cir. 2011). The forum selection clause in the Settlement Agreement is mandatory insofar as it relates to the issue of breach of the Settlement Agreement. The clause provides that the parties "consent to *exclusive jurisdiction and venue* in the United States District Court for the District of Washington, and if for any reason that court lacks subject-matter jurisdiction, state court located in King County for the adjudication of *any dispute arising from or relating* to this Agreement." Settlement Agreement § 7 (emphasis added). The reference to "exclusive" jurisdiction over and venue for "any dispute" makes plain that the clause is mandatory and inclusive of all claims asserting breaches of the Settlement Agreement. The Settlement Agreement also contains a merger clause, which states in unambiguous terms that the Settlement Agreement "supersedes *all prior negotiations and agreements*, both written and oral, between the Parties with respect to *this subject matter*." *Id.* § 12 (emphasis added). "These provisions require that disputes arising out of the" Settlement Agreement "be adjudicated" in state or federal court in

Washington. *Golden Empire*, 764 F.3d at 216.[4]

The Arbitrator exceeded his authority by determining PandaVida's liability for alleged breaches of the Settlement Agreement. The Arbitrator held that "the evidence establishe[d] multiple violations of the Settlement Agreement." Interim Award at 18. Accordingly, the Arbitrator "[found] in favor of [Amazon] and against [PandaVida] on [Amazon's] counterclaim[] for beach of the 2021 Settlement agreement[.]" *Id.* at 20. By determining PandaVida's liability for breach of the Settlement Agreement, the Arbitrator resolved a claim that arose under the Settlement Agreement. Therefore, in making the arbitral award, the Arbitrator reached an issue that he was "clearly prohibited" from reaching by operation of the mandatory forum selection clause in the Settlement Agreement. *Jock*, 646 F.3d at 122. Accordingly, the portion of the award finding PandaVida liable for breaches of the Settlement Agreement must be vacated because the Arbitrator exceeded his authority in resolving that claim.

On this record, the Court is unable to determine whether and to what extent the damages award should be vacated. A court reviewing an arbitration order "can confirm and/or vacate the award, either in whole or in part." *D.H. Blair & Co.*, 462 F.3d at 104. Here, though the Court can determine that the entire damages award should not be vacated, it cannot determine what portion of the damages award should be vacated, if any. The Arbitrator's decision to award fees and exemplary damages should not be vacated. As described above, the Arbitrator properly reached the issue of whether PandaVida violated the Washington Consumer Protection Act. The Arbitrator found that

[4] To the extent that the forum selection clause's reference to "disputes arising from or related to" sweeps in the entire set of claims that were the subject of the arbitration, the parties' conduct subsequent to the execution of the Settlement Agreement evinced an agreement to arbitrate those claims for the reasons stated above.

Amazon's authorities support the conclusion that, at the very least, the merger clause forecloses arbitration of Settlement Agreement breach claims. Amazon cites several cases that hold that a merger clause invalidates a prior agreement only to the extent that the two directly conflict. *See, e.g. Hickey v. Smith*, No. 1:23-CV-02538, 2025 WL 692052, at *8 (S.D.N.Y. Mar. 3, 2025). As it relates to the issue of whether PandaVida breached the Settlement Agreement, the Settlement Agreement and the BSA do directly conflict: claims of breach cannot be subject to the exclusive jurisdiction of the Washington courts *and* be subject to arbitration before the AAA.

PandaVida violated that statute and awarded Amazon $25,000 in exemplary damages pursuant to the statute. Interim Award at 18. The Arbitrator held that the statute allowed an award of "reasonable attorneys' fees." *Id.* Though the Arbitrator also found that Amazon was entitled to an award of attorneys' fees for the breaches of the Settlement Agreement, the Arbitrator held that the "fees incurred by [Amazon] . . . recoverable under the Act . . . subsume[d] those awarded for breach of the Settlement Agreement." *Id.* Therefore, there was a colorable justification for the portion of the award granting Amazon fees and costs. The Arbitrator awarded Amazon $236,009.50 in attorneys' fees and $3,702.52 in costs. Final Award at 1. Therefore, of the "total award" of $578,511.02, the Arbitrator did not exceed his authority in awarding at least $264,712.02 of the total amount.[5] Accordingly, at least some portion of the award must be confirmed.

However, the Court cannot determine that the entire award of damages should be confirmed. Unlike his determination that the award of attorneys' fees under the WCPA subsumed any fees award under the Settlement Agreement, the Arbitrator did not find that every breach of the Settlement Agreement was a breach of the BSA or a violation of the WCPA. Instead, he found that the obligations under the Settlement Agreement were "in *most* cases duplicative" of the obligations under the BSA. Interim Award at 17 (emphasis added). He concluded that "the evidence established multiple violations of the" Settlement Agreement. *Id.* He also found that Amazon's damages for the breach counterclaims only "*largely* mirror[ed] those" under the WCPA. *Id.* at 18. The Arbitrator thus awarded $299,999.00 in damages, but did not specify what portion of that award, if any, arose from breaches of the Settlement Agreement that were not breaches of the BSA

[5] The Arbitrator awarded Amazon $299,999 in damages arising out of PandaVida's breaches of the BSA, the 2021 Settlement, and its violations of the WCPA. Interim Award at 19. The total of that amount, in addition to the exemplary damages and the awarded attorneys' fees is $564,711.02. That is different from the total award as calculated by the Arbitrator by $13,800. Nothing in the record explicitly identifies the source of this discrepancy. However, that is precisely the difference between the amount of the attorneys' fees requested by Amazon—$249,809.50—and the amount the Arbitrator explicitly awarded—$236,009.50. *See* Final Award. Therefore, the Court understands that the "total award" amount may have been calculated using the requested amount of attorneys' fees, rather than the awarded amount. The Court directs the parties to include their positions on this issue in their joint submission as described *infra*.

or violations of the WCPA. *See generally id.*[6] Thus, while the award should not be vacated in full, the record before the Court is not sufficient to determine what portion of the award, if any, must be vacated as a result of the Arbitrator's determination of liability under the Settlement Agreement.

**B. Manifest Disregard**

PandaVida has not shown that the Arbitrator acted in manifest disregard of the law such that the entire award should be vacated. "[A] litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625–26 (2d Cir. 2021) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010)). As with arguments that an arbitrator exceeded its powers, an award will be upheld against a challenge that it manifestly disregarded the law "so long as 'the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract.'" *Id.* at 626 (quoting *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011)). "'Vacatur is only warranted, by contrast, when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice.'" *Id.* (quoting *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019)).

"To succeed in challenging an award under the manifest disregard standard, a party must make 'a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.'" *Id.* (quoting *Schwartz*, 665 F.3d at 452). "In addition to this

[6] Nor does the remainder of the record before the Court identify what portion of the award arose from violations of the Settlement Agreement that were not also violations of the BSA. In connection with its motion to confirm the arbitral award, Amazon provides the brief it submitted in advance of the arbitration hearing. *See* Amazon Arb. Br. That brief argues that Amazon is entitled to damages in the amount awarded by the Arbitrator—$299,999—on its BSA breach claim, its Settlement Agreement breach claim, and its WCPA claim. *Id.* at 13–14.

'subjective component,' a finding of manifest disregard requires an objective determination that the disregarded legal principle was 'well defined, explicit, and clearly applicable.'" *Id.* (quoting *Westerbeke*, 304 F.3d at 209). "With respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract." *T.Co Metals*, 592 F.3d at 339.

In assessing these components, "[a] federal court may not conduct a reassessment of the evidentiary record," except "for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law." *Wallace*, 378 F.3d at 193. "Instead, whatever the weight of the evidence considered as a whole, '[i]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.'" *Id.* (*Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991)). "Only this approach to the evidentiary record is consistent with the 'great deference' which must be paid to arbitral panels by federal courts." *Id.* (quoting *Duferco Int'l. Steel Trading*, 333 F.3d at 388).

PandaVida has not met its burden to demonstrate that the award should be vacated for manifest disregard of the law. In its opening brief, PandaVida argues that the Arbitrator issued the award in manifest disregard of the law for three reasons: first, because he lacked jurisdiction over the entire proceeding; second, because he misinterpreted the BSA; and third, because the awarded amount of damages was arbitrary. None of these bases demonstrate the type of "egregious impropriety" that mandate vacatur of the entire award. First, as addressed above, PandaVida waived its argument that the Arbitrator "lacked jurisdiction over the entire proceeding" by initiating the arbitration and only objecting to the Arbitrator's jurisdiction to reach the issue of whether PandaVida breached the Settlement Agreement.

The second and third asserted instances of "manifest disregard of the law" also do not justify vacatur of the entire award. There exists a colorable basis for the Arbitrator's holding that

PandaVida was not entitled to reimbursement of storage fees based on the terms of the BSA. Interim Award at 17. The portion of the BSA entitling Amazon to payment of storage fees read as follows:

> You will pay us the applicable fees described in the applicable Fulfillment by Amazon Fee Schedule. You will be charged the Storage Fees beginning on the day (up to midnight) that the Unit arrives at a fulfillment center *and is available for fulfillment by Amazon* (or in the case of any Unsuitable Unit, the arrival day (up to midnight)), until the earlier of: (a) the day (up to midnight) we receive a valid customer order for such product *or a request from you to return or dispose of the Unit*; or (b) the day (up to midnight) we actually ship the Unit to your designated return location or dispose of the Unit.

BSA § F-9.1 (emphases added). Thus, the BSA authorized Amazon to assess fees for the period that began when the inventory arrived at an Amazon facility and became "available for fulfillment." PandaVida argues that once its account was suspended, its inventory was no longer "available for fulfillment." However, the storage fee provision does not limit Amazon's ability to charge fees for storage of inventory that—after having arrived and become available for fulfillment—later becomes unavailable. PandaVida also argues that the Arbitrator ignored evidence that it requested a return of the inventory in June and September 2023. *See* Closing Presentation at 12–13 (referring to "Exhibit R-19"). But the Arbitrator concluded that "[Amazon] was within its contractual right" to withhold PandaVida's inventory under another policy incorporated into the BSA—Amazon's Product Authenticity and Quality Policy. Interim Award at 17. Finally, the Arbitrator concluded that PandaVida "also expressly requested or demanded that [Amazon] retain its . . . inventory during the pendency of this action." *Id.* Thus, the Arbitrator's conclusion that PandaVida was not entitled to the reimbursement of storage fees even after PandaVida's account was suspended and PandaVida demanded return of its inventory was not in manifest disregard of the law.

Nor was the Arbitrator's calculation of the amount of damages in manifest disregard of the law. PandaVida does not identify any governing legal principle that the Arbitrator violated in calculating the amount of damages. And "[e]ven where explanation for an award is deficient or non-

existent, [courts] will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." *T.Co Metals, LLC*, 592 F.3d at 339. Amazon asserted damages arising out of breaches of the BSA "of $299,999 in invalid and unsupported reimbursements paid to [PandaVida] based on invoices that failed to support a legitimate supply chain." Amazon Arb. Br. at 18. As described above, it is likely that some portion of the award of damages was based on the Arbitrator's determination that Amazon had established PandaVida's liability on counterclaims that the Arbitrator could properly resolve. Accordingly, the Court cannot vacate the entirety of that award for manifest disregard of the law.

**C. Next Steps**

For the forgoing reasons, the Court does not believe it can fully resolve the cross-motions to vacate or confirm the Arbitrator's award in this case. The Court orders the parties to meet and confer on the appropriate path forward.

In particular, the Court orders the parties to meet and confer on whether it is appropriate to remand the award to the Arbitrator. The Second Circuit has "[r]ecogniz[ed] that if there is to be any meaningful judicial review, an arbitrator's award cannot be absolutely immune from scrutiny, [and] courts on occasion may remand awards to arbitrators to clarify the meaning or effect of an award or to determine whether the arbitrator has in some way exceeded his powers[.]" *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 894 (2d Cir. 1985) (internal citations omitted). "Where, as here, an arbitrator's award appears to have been reached on the basis of a . . . mathematical calculation, it is desirable, and in some cases may be necessary, to know the basis for the calculations underlying the award. A remand for clarification in such circumstances would not improperly require arbitrators to reveal their reasons, but would instead simply require them to fulfill their obligation to explain the award sufficiently to permit effective judicial review." *Id.* "Such a limited review of an arbitrator's award is necessary if arbitration is to serve as a quick, inexpensive and informal means of private dispute

resolution." *Id.* (citation and quotation omitted).

Here, because the Court holds that the Arbitrator exceed his powers in reaching the issue of liability under the Settlement Agreement, it is "necessary" to know the apportionment of the damages portion of the award such that the Court can effectively review the arbitral award. Remand is one possible approach for the Court to become apprised of the basis of the award. The Court therefore orders the parties to jointly file a letter no later than one week following the date of this order identifying their respective positions on next steps, and in particular whether remand is necessary.

## IV. CONCLUSION

For the reasons stated above, the Court cannot resolve the parties' cross-petitions. The parties are directed to meet and confer and file a joint letter as specified above no later than one week following the date of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 24.

SO ORDERED.

Dated: July 7, 2026
New York, New York

GREGORY H. WOODS
United States District Judge